Thomas Andrew BIAS, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–365.

Court of Criminal Appeals of Oklahoma.

Feb. 16, 1977.

Rehearing Denied March 21, 1977.

W. Creekmore Wallace, II, Sapulpa, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

PER CURIAM.

Appellant, Thomas Andrew Bias, hereinafter referred to as defendant, was charged conjointly with five co-defendants in the District Court, Creek County, Case No. CRF–74–123, for the offense of Murder in the First Degree, in violation of 21 O.S. Supp.1973, § 701.1(2). Defendant was tried separately, convicted and sentenced to death. From said judgment and sentence a timely appeal has been perfected to this Court.

At some dark hour during the night of June 19–20, 1974, Mrs. Susan Bush, an elderly Creek County widow, died. Her body was found among charred remnants of her fire-destroyed house, submerged in a water-filled bathtub, an electrical cord binding one arm and three stab wounds in her neck.

Four weeks later the 17–year-old defendant was arrested on a charge of intoxication and was questioned by police for two to three hours. Some hours later, Clifford Rame, a co-defendant, was arrested and his statement implicated the defendant in the death of Mrs. Bush. He said that the defendant slashed her throat. Four other co-defendants were arrested. Two of them, the defendant and Jess Henson, were convicted of murder in the first degree. Two others pleaded guilty to manslaughter in the first degree, and the final two co-defendants received immunity from prosecution to testify at the defendant's trial.

One witness testified he purchased five guns from Henson which were delivered by the defendant, and one of those guns was later identified as belonging to the victim. Another witness said that the defendant admitted he had cut Mrs. Bush's throat.

Clifford Rame, the key prosecution witness, testified that following an evening of drinking and drugs he, the defendant and three others, acting upon the instructions of Jess Henson, went to the rural home of Mrs. Susan Bush. He said the defendant used a ruse to gain access to the house, then held a gun on Mrs. Bush and demanded money. When she denied having any money and a search of the premises proved fruitless, the victim was held under water in her bathtub for periods of time to force her to disclose the hiding place. Following further denials regarding a hiding place, a kitchen knife was used to end her life. Rame said the five ransacked her house, taking several items, including guns, left to get gasoline, and then returned and set her house on fire.

■ Defendant's first assignment of error is in substance that he was denied a speedy trial. He notes he was arrested on July 18, 1974, but not brought to trial until May 20, 1975. During this period of time there was a certification hearing, mental examination, preliminary hearing, and arraignment. Defendant twice moved the trial court for severance. Over objection of defendant venue was changed to Muskogee County on November 8, to Tulsa County on

January 8, and later to McIntosh County on February 21, 1975. On a writ of mandamus (*State of Oklahoma ex rel. Young v. Warren,* Okl.Cr., 536 P.2d 965 (1975)), this Court sent defendant's case back to Creek County on March 7, 1975.

There are four guidelines to consider in a speedy trial issue: Length of delay, cause of delay, waiver by defendant and prejudice to defendant. See, *Wilson v. District Court of Oklahoma County,* Okl.Cr., 471 P.2d 939 (1970); *State ex rel. Trusty v. Graham,* Okl.Cr., 525 P.2d 1231 (1974).

As to prejudice, defendant argues he subpoenaed Newt Wheeler for trial but he could not be located. Defendant also asserts inconsistencies of witness testimony and loss of plea bargaining in his argument for prejudice. Defendant also says that much of the delay resulted from the prosecution's "misunderstanding of the law."

In *Hampton v. State of Oklahoma,* 368 F.2d 9, 12 (10th Cir. 1966), it was stated, "Mere passage of time does not establish an unconstitutional denial of speedy trial or due process," and "right to a speedy trial is relative and must be determined in light of the circumstances of each case." In *Wood v. United States,* 317 F.2d 736 (10th Cir. 1963), the Tenth Circuit Court of Appeals said, "accused should be tried as soon as the orderly conduct of the business of the court permits." In *Coggins v. Shumate,* Okl.Cr., 401 P.2d 995, 996 (1965), this Court said:

> "Generally speaking, a 'speedy trial' is one conducted according to prevailing rules, regulations, and proceedings of law free from arbitrary, vexatious and oppressive delays. The right does not require a trial immediately upon arrest, or the filing of an indictment or information; but requires that the trial be had as soon as reasonably possible, within the statutory requirements, without depriving the prosecution of a reasonable time to prepare for trial."

Considering the number of defendants, and attorneys, the various motions filed and argued, the several stages from certification to trial, and the court-initiated venue changes, we find the ten months between arrest and trial not to be unconstitutionally excessive. For prejudice defendant states the inconsistencies in witnesses testimony (but he fails to refer this Court to examples), and a missing witness (but defendant fails to allege what this witness would testify to). Therefore, this Court finds the defendant's first assignment of error to be without merit.

Defendant's second assignment of error challenges the Juvenile Court's discretion in certifying the defendant to stand trial as an adult. Defendant notes the eight guidelines for certification contained in 10 O.S.Supp.1974, § 1112(b), which are emphasized in *J.T.P. v. State,* Okl.Cr., 544 P.2d 1270 (1975) and refined in *Calhoon v. State,* Okl.Cr., 548 P.2d 1037 (1976). But, in utilizing these guidelines we said in *Calhoon v. State,* supra, that the trial court must find "substantial evidence" that the child is not amenable to rehabilitation under existing juvenile programs. We are of the opinion that the State has met this burden.

There was testimony that the defendant dropped out of school, and that his only contact with authorities involved a charge of cursing a policy officer, a charge later dismissed when the defendant apologized to the officer. Defendant was arrested on a later charge when a car in which he was riding was found to contain a loaded Colt .45 pistol. However, the most damaging testimony regarding defendant's potential for rehabilitation came from Barbara Rame, sister of two co-defendants. She was in a jail cell adjacent to the defendant when she asked him if her brothers were involved in the killing. She testified that the defendant "said something to the effect that they weren't cold-blooded like he was and that he really didn't give a dam (sic) about the old bitch." (Juvenile Hearing, page 98)

Defense challenges the finding of prosecutive merit, one of the two main findings required by *Calhoon v. State,* supra, in order to certify a juvenile to stand trial as an adult, the other required finding being nonamenability to rehabilitation. Defend-

ant objected to the testimony of Jack McKenzie relating to co-defendant Clifford Rame's confession, and objection should have been sustained. Hearsay is forbidden in juvenile adjudicatory hearings. See, 10 O.S.Supp.1975, § 1111, which provides that said hearings shall be conducted "according to the rules of evidence."

We, however, view this as harmless error (see 20 O.S.1971, § 3001), and strictly cumulative so far as proving prosecutive merit in light of the other evidence, especially testimony that one of the victim's guns was sold to a B. J. McDaris by co-defendant Jess Henson and the testimony that the defendant brought the gun to Henson when the sale took place. Then, there was Barbara Rame's testimony of overhearing defendant and two co-defendants talking about the police searching Lake Sahoma for the murder weapon, and their expressing hope for rain so nothing could be found. Miss Rame quoted the defendant as saying that if it did rain, "the mud would be at least a foot thick and that you couldn't see anything with mud a foot thick." (Juvenile Hearing Transcript, page 98) We are of the opinion that there was sufficient evidence to support the court's finding of prosecutive merit and of nonamenability, the latter requirement being met by the seriousness and violent nature of the crime, its premeditation and defendant's admission of callous disregard and "cold blooded" attitude toward the victim and the crime. Defendant's second assignment of error is without merit.

Defendant cites, as his third assignment of error, the contention that the State failed in its burden of proof to show that information used against the defendant was obtained from sources other than the defendant's illegally obtained statement. The 17-year-old defendant was first arrested on July 18, 1974, on a charge of intoxication as he sat behind the wheel of a car. He was taken to Police Headquarters and questioned without the presence of his parents or attorney. Shortly thereafter, Clifford Rame was arrested and gave a properly obtained statement implicating the defend-

ant. Defendant contends Rame was arrested and questioned based on information obtained from the defendant himself.

Title 10 O.S.1971, § 1109(a), states:

"No information gained by questioning a child shall be admissible into evidence against the child unless the questioning . . . is done in the presence of said child's parents, guardian, attorney, or the legal custodian of the child, and not until the child and his parents, or guardian, or other legal custodian shall be fully advised of their constitutional and legal rights . . . ."

The defendant challenges evidence used against him under the "fruits of the poisonous tree doctrine," delineated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

However, we need not reach that constitutional question. Transcript testimony reveals that the police had information from at least two independent, although unnamed, informants regarding defendant's role in the crime prior to his arrest.

During a hearing on a motion to suppress that information, on October 30, 1974, Officer Moore was asked:

"Q. Okay, prior to this time when he was placed under arrest, Mr. Moore, did you yourself have any indication or any suspicion that Mr. Bias was involved in the charge for which he's on trial, he's here today?

"A. Yes, sir.

"Q. Okay, would you state to me just what that basis was?

"A. Through two separate, confidential informants.

\* \* \* \* \* \*

"Q. Okay, at the time Mr. Bias was arrested did you have sufficient evidence in your mind to arrest him for this murder he's charged with today?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Would it be fair ____ strike that. Were either or both of these young men arrested based upon information gained from the questioning of Mr. Bias?

"A. No, sir.

"Q. On independent evidence?

"A. Yes, sir." (at pages 22–26)

Investigator Jack McKenzie testified in the Juvenile Hearing as follows:

"Q. *Prior to July 18 would you in your opinion consider the crime to have been solved? Did you have a pretty good idea who did it?*

"A. *Yes, sir.*

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. *Had you been supplied prior to your talking to Mr. Clifford Rame, had you been supplied with any of the information that arose from the questioning of Thomas Andrew Bias?*

"A. *No, sir.*" (Emphasis added, at pages 175–176)

In light of Mr. McKenzie's testimony this Court finds there was ample evidence that information of defendant's involvement in the crime was not the result of defendant's statement, and we therefore dismiss defendant's third assignment of error.

█ The defendant's fourth assignment of error is that the trial court abused its discretion in denying his motion for continuance when his prior motion for severance was unexpectedly granted the day of the trial. This resulted in prejudice, he claims, because he and counsel for a co-defendant had agreed to split the voir dire.

On May 19, 1975, the day before trial, defendant filed a renewed motion for severance, and the trial court took it under advisement. The following day the prosecutor agreed to severance and joined in the motion. When that occurred the defendant backed up. He said he still wanted severance, but only from those defendants with "antagonistic" defenses. Defendant states he wanted only a short continuance—not past the jury docket—to prepare the voir dire, but the record reflects that defendant asked for a "reasonable continuance" without specifying how long he would need.

This Court has frequently held that motions for continuance are within the trial court's discretion and absent a showing of abuse of such discretion this Court will not

reverse. See, *Brown v. State,* Okl.Cr., 456 P.2d 604 (1969). In light of the fact that it was defendant's motion for severance filed the day before trial that was sustained, we find this assignment of error without merit.

█ Defendant's fifth assignment of error contends that the trial court should have excluded three veniremen for cause due to statements made by them in voir dire. These prospective jurors were later removed on peremptory challenges. In his brief, defendant states that venireman Garringer said he knew several of the witnesses, had read media accounts of the crime which indicated defendant committed the actual slaying, and that "somebody has to prove his innocence." Venireman Titus said he knew two witnesses and the prosecutor. Venireman Anglin said of the defendant, "if he's not guilty, he has to be proved innocent, doesn't he?" and "if a person is found guilty of killing somebody, either drunk or on dope, I can't believe that it would be manslaughter."

Pertinent text of the voir dire examination of venireman Garringer, as it appears in the record, is as follows:

"MR. WALLACE: Okay. Do you think Mr. Bias has to prove that he is innocent?

"JUROR GARRINGER: Somebody has to prove his innocence.

"MR. WALLACE: Judge, object to the juror for cause, Your Honor.

"THE COURT: Mr. Garringer, you understand the law in this state states that a defendant is presumed to be innocent and that presumption of innocence carries with him throughout the entire trial until it is overcome by competent evidence presented by the State of Oklahoma to your satisfaction?

"JUROR GARRINGER: That's right.

"THE COURT: And would you in this case allow that presumption of innocence to continue with this defendant until it's overcome, if it ever is, by competent evidence from the State of Oklahoma before you would entertain the possibility of him being guilty in this case?

"JUROR GARRINGER: That's right.

"THE COURT: Do you understand that it is the burden of proof in this state, burden placed upon the State of Oklahoma to prove to your satisfaction beyond a reasonable doubt the material allegations as alleged in this information before you could return a verdict of guilty on this defendant?

"JUROR GARRINGER: That's right.

"THE COURT: Would you follow that law?

"JUROR GARRINGER: Yes, sir.

"THE COURT: All right, I think you can have further questioning." (Tr. 115–116)

Pertinent text of the voir dire examination of venireman Titus is as follows:

"[THE COURT:] Do you know these attorneys?

"JUROR TITUS: I do David.

"THE COURT: You know Mr. Young?

"JUROR TITUS: Yes.

"THE COURT: How long have you known Mr. Young?

"JUROR TITUS: I'd say fifteen years.

"THE COURT: And is that acquaintanceship a close acquaintanceship with him?

"JUROR TITUS: He represented the company that I worked for at that time.

"THE COURT: Did he ever represent you or your family personally in any matters?

"JUROR TITUS: No, sir.

"THE COURT: Is there anything in that relationship that you have had with him that would cause you to either give more or less to his side of this lawsuit?

"JUROR TITUS: No, sir.

"THE COURT: Outside of that relationship with him representing your company, have you had any other relationship, do you visit with him or is your acquaintanceship a close acquaintanceship or casual to that extent?

"JUROR TITUS: Casual, if any." (Tr. 262–263)

\* \* \* \* \* \*

"MR. WALLACE: Mr. Coleman is listed on the list provided me by the District Attorney's office as a possible witness in this case, and based on the question I asked you earlier, and I want you to think about this, would Mr. Coleman's testimony or the testimony of any other police officer that might appear here today that just because he is a police officer, would it make you treat his testimony any different than any other witness?

"JUROR TITUS: Under the circumstances I don't think so." (Tr. 273)

\* \* \* \* \* \*

"MR. WALLACE: Junior Banks?

"JUROR TITUS: Yes, sir, I know a Junior Banks, lives in Sapulpa or in that area, works for L. B. Jackson.

"MR. WALLACE: Yes, sir, that's the one.

"Would your relationship with Mr. Banks cause you, if he appears as a witness, to be, believe him more than you would anybody else?

"JUROR TITUS: Well, I would think not.

"MR. WALLACE: Is your relationship with him casual?

"JUROR TITUS: Casual, uh, huh." (Tr. 297)

Pertinent text of the voir dire examination of venireman Anglin as it appears in the record, is as follows:

"MR. WALLACE: All right. Will you require me prior to the State proving to you beyond a reasonable doubt that Andy Bias is guilty of this charge, will you require me or Andy to prove him innocent?

"JUROR ANGLIN: Well, if he's not guilty he has to be proved innocent, doesn't he?

"MR. WALLACE: In answer to your question. No, sir.

"What I'm trying to get across, is under the law I am not required to come forward with any evidence whatsoever of his innocence. My primary requirement is to establish that he, that they cannot prove that he was guilty, can you understand that?

"JUROR ANGLIN: Yeah, I understand what you mean now.

"MR. WALLACE: Now, I don't have to put on any evidence whatsoever if I deem it necessary to show that Andy didn't do it, that the burden is entirely upon the State of Oklahoma to prove that he did do it and that they must prove each and every element of first degree murder before you can find him guilty of that. Do you understand that, sir?

"JUROR ANGLIN: Yeah.

"MR. WALLACE: Should the Judge instruct that is the law you will follow that instruction?

"JUROR ANGLIN: Yeah.

"MR. WALLACE: And you will not require me to prove Andy's innocence unless they establish beyond a reasonable doubt in your mind that he is guilty?

"JUROR ANGLIN: Right.

"MR. WALLACE: And if they fail to show some element to prove to you beyond a reasonable doubt to a moral certainty if they fail to show some element and the Judge will instruct you on what the elements are, and you feel that they failed to show you beyond a reasonable doubt, will you resolve that doubt in favor of Andy, assuming that the Judge instructs you to?

"JUROR ANGLIN: Yeah, if they prove that he's not guilty, you got to go, you know, for him.

"MR. WALLACE: What I'm trying to say is this, the Judge will delineate under the statute several elements or several things that must be proved to you in order for the State to establish that Mr. Bias is guilty of first degree murder.

"Should the State in your own mind fail to show any of those elements or if there is a doubt in your mind as to the truth of any of those elements, will you promise me that you will resolve that doubt in Andy's favor?

"JUROR ANGLIN: That's the only way you can go if there's a doubt." (Tr. 334–336)

From even the most cursory examination of the full text of the voir dire examination, it is clear that counsel's contentions are wholly without merit, for it affirmatively appears that each of the veniremen responded that he would follow the court's instructions, presume the defendant to be innocent until proven guilty, or that his relationships with the proposed witnesses were casual at best and would not influence him.

The defense cites the rule in *Justus v. State,* Okl.Cr., 542 P.2d 598, 607 (1975), as governing this assignment of error when stating:

"[I]f . . . a venireman . . . is uncertain whether he could stand indifferent between the defendant and the State in deliberating his verdict according to the law and the evidence, then he has to that extent forewarned the court that he is undecided whether he could comply with the oath of a juror. A challenge for cause should be granted against such a venireman, . . . ." (Citations omitted)

But such is not the case here. The transcript reveals the veniremen said they could put aside any opinions already formed. This Court reaffirmed our holding in *Littrell v. State,* 22 Okl.Cr. 1, 209 P. 184 (1922), in the 1973 case of *Vavra v. State,* Okl.Cr., 509 P.2d 1379, when we quoted from *Littrell* as follows:

" 'Ordinarily, where a juror testified that he believes he can and the court finds as a matter of fact that he would, if selected, render an impartial verdict upon the evidence, he is an impartial juror, under our Constitution and the statutes of this state.' " 509 P.2d at 1385

Whether a juror should be excluded rests in the sound discretion of the trial court. Unless such discretion is abused, there is no error. *Bickerstaff v. State,* Okl. Cr., 446 P.2d 73 (1968). Each venireman underwent lengthy voir dire, and taking all the questions and responses together, we are of the opinion that the trial court did not abuse its discretion, and therefore find defendant's fifth assignment of error to be without merit.

Defendant contends in his next assignment of error that the court, an assigned District Judge, was without authority to summon additional jurors, and that his ac-

tion in doing so was in violation of 38 O.S.1971, §§ 20 and 21.

The power of an assigned judge is found in 20 O.S.1971, § 103.1A, which states that an assigned judge "shall have continuing authority without further assignment, to make final disposition of any matter regularly submitted or tried before him during the term or period of time of his designation, . . ."; and, in 20 O.S.1971, § 103.-1B, which states that an assigned judge "may make any order of a nature not requiring notice and hearing in any cause theretofore heard, or being heard, by him [in his assigned county]."

■ Title 38 O.S.1971, § 21, clearly gives the trial court authority to draw additional veniremen, and to deny that same authority to an assigned judge is patently frivolous. We are of the opinion, and therefore hold, that an assigned judge has the same power to summons a jury under the provisions of 38 O.S.1971, § 21, as could have been exercised by the district judge whom he was assigned to replace. Accordingly, we find this assignment of error to be without merit.

■ Defendant next contends that the trial court erred in allowing juror Walkingstick to remain on the jury panel when she admitted serving on the panel for two weeks prior to the start of the evidence presentation in this case, in violation of 38 O.S.1971, § 21. Defendant cites no case authority for this assignment of error.

Defendant, after carefully examining the juror in detail and ascertaining she had served on the jury two weeks before, expressly passed the juror for cause.

It is clear that the defendant was well aware of the error about which he now complains and by failing to timely object to Mrs. Walkingstick, and by expressly passing her for cause, he waived the error, if any. In *Carr v. State*, 65 Okl.Cr. 201, 84 P.2d 42 (1938), this Court stated as follows:

"The rule is well settled that a known ground of disqualification to a juror before or during the progress of the trial, is waived by withholding it, or refusing or declining to raise the objection until after verdict. . . ." 84 P.2d at page 46 (Citations omitted)

■ Defendant's seventh assignment of error challenges the trial court's failure to reject for cause veniremen who on voir dire expressed doubt regarding the death penalty then in force. Defendant cites *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), for the general rule and *Justus v. State*, supra, which distinguished *Witherspoon* in cases where the death penalty is mandatory upon a finding of guilt. Defendant argues this case should be distinguished from *Justus* on grounds that an instruction of the lesser included offense of manslaughter in the first degree was given to the jury here. This Court feels, however, that the point is moot in light of the Supreme Court's decision in *Davis v. Oklahoma*, 428 U.S. 907, 96 S.Ct. 3217, 49 L.Ed.2d 1215 (1976), which ruled Oklahoma's death statute unconstitutional.

In *Williams v. State*, Okl.Cr., 542 P.2d 554 (1975), we said that in *Justus v. State*, supra, this Court held that the applicability of *Witherspoon* was limited to those cases where upon conviction for the offense charged the jury has discretion to resolve whether the defendant shall suffer death or some lesser degree of punishment.

In *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 1790, 20 L.Ed.2d 797 (1968), decided the same day as *Witherspoon v. Illinois*, supra, the Supreme Court said:

"In *Witherspoon v. Illinois*, . . . we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. Our decision in *Witherspoon* does not govern the present case, because here the jury recommended a sentence of life imprisonment. . . ." 391 U.S. at 544, 88 S.Ct. at 1790.

Further, as we said in the recent case of *Jones v. State*, Okl.Cr., 555 P.2d 1061, 1066 (1976):

"In light of *Riggs v. Branch,* Okl.Cr., 554 P.2d 823 (1976) the only appropriate sentence which could constitutionally have been imposed by the trial court in the instant case was life imprisonment at hard labor. This being true, the trial court's action in excusing the jurors, if error, would not require reversal in light of *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 . . ., wherein the Supreme Court held *Witherspoon* inapplicable where a sentence of life imprisonment was imposed. Were this case to be retried, the trial court could not impose more than a life sentence."

We, therefore, find this assignment of error to be without merit.

■ Defendant, in his eighth assignment of error, argues that the prosecutor, in his opening statement, improperly referred to evidence taken from defendant's illegally obtained statement which was not proved by other witnesses at trial. Defendant specifically objects to the following statement used in the opening argument:

"* . . . . The evidence will be that the real and true purpose of this defendant, fully invading [the victim's] home that night, was to case the place and be sure there was no one else there. He went in and used the pretext that he was using the phone to call, and he pretended to dial a number and looked around and saw no one there." (Tr. 1588)

The State admits the illegality of the defendant's statement, but argues that the prosecutor's comment was a legitimate inference drawn from testimony to be presented in the trial, and, regardless, for such comment to be the basis for reversible error it must have been made in bad faith or be manifestly prejudicial to the defendant. We agree.

Witness Rame testified that co-defendant Jess Henson gave the defendant the following instructions:

"A. He told—he said to go up and knock on the door and say we was his son, Walter, and we had a flat and she'd let— we had car trouble, and she'd let us in.

We needed to call Jess, because we had car trouble and we needed to borrow a phone and she'd let us in. That's how we'd get in." (Tr. 1942)

In *Harvell v. State,* Okl.Cr., 395 P.2d 331, 338 (1964), and in many cases since, we said:

"While it is the duty of counsel in making an opening statement to state the facts fairly, and to refrain from stating facts which he can not or will not be permitted to prove, the mere violation of the rule by a prosecuting attorney is not of itself evidence that he acted in bad faith, and does not constitute reversible error. The conclusion of the Court is that such overstatements react upon the party making them, rather than injuring the party against whom they were made. . . . we are of the opinion that such statements did not influence the verdict."

We conclude the prosecutor was merely laying the scene for the testimony of witness Rame and that the objected to comment in his opening statement was not made in bad faith but was a conclusion running from the testimony of the witness. We find no prejudice to the defendant in same, and therefore dismiss this assignment of error.

■ The defendant next argues that the trial court erred in allowing into evidence color slides (shown on a 4½ foot by 4½ foot screen) of the murder victim, when black and white photographs and anatomical exhibits were available.

The defendant cites *Oxendine v. State,* Okl.Cr., 335 P.2d 940 (1958). However, we view *Oxendine* as being clearly distinguishable from the case at bar. In *Oxendine,* five colored photo slides of the murder victim's nude body—taken after extensive autopsy surgery had been performed—were introduced as evidence of the gunshot wounds. We reversed, saying the pictures had no probative value but merely appealed to the passion and prejudice of the jury.

In *Oxendine* this Court said that the introduction of photographs taken subsequent to a homicide is largely in the discretion of the trial court and unless this discretion is

abused it will not be cause for reversal. In the Syllabus to *Oxendine* this Court set out the following guidelines for the introduction of photographs:

"2. If the principal effect of demonstrative evidence such as photographs is to arouse the passion of the jury and inflame them against the defendant because of the horror of the crime, the evidence must be excluded.

"3. On the other hand, if the evidence has probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, the evidence is admissible even if it is gruesome and may incidentally arouse the passions of the jury."

Also see, *Pate v. State,* Okl.Cr., 361 P.2d 1086 (1961).

Of the four controverted color slides in the case at bar, two depict the condition of the face and neck, including unburned hair, one shows a neck wound and the fourth shows the electric cord used to tie the victim's wrist. The State correctly argues that these portrayals corroborate the testimony of the investigating officers, the pathologist and the other witnesses, including witness Rame, co-defendant in the case. Further, we hold the slides are not so gruesome as to cross that line between probative value and prejudicial evidence to the jury. We find this assignment of error to be without basis, and deny same.

■ Defendant next argues reversible error was committed when a clear bag was introduced into evidence, said bag containing bullets, which were the intended evidence, and also a substance thought to be marihuana, which was not intended as evidence. The defense argues that when a defendant is put on trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and evidence of other crimes committed either prior or subsequent to the offense of which he is on trial is inadmissible. See, *Pruitt v. State,* Okl.Cr., 518 P.2d 1114 (1974).

We observe that the defendant made no objection to the introduction of the clear plastic bag. (Tr. 1741) Defendant himself admits only a "possibility" that the jury saw the alleged marihuana, while the prosecutor stated the evidence was never handed to the jury. (Tr. 1832) The trial court stated, "All I can see is some bullets, I don't know what's in there." (Tr. 1832) Later, the alleged marihuana was removed from the bag. We find there was no prejudice to the defendant in that there is no evidence the jury saw the alleged marihuana or could identify it, and we therefore find this assignment of error to be without merit.

■ Defendant also argues the prosecutor improperly cross-examined Father Murtagh, a character witness called by the defendant. The question objected to by the defendant was as follows:

"Q. [By Mr. Young] Have you ever heard that on the 30th day of June, of 1974, that Andy Bias and Kenneth Gregory, Larry Henson and Jess Henson were in Decatur, Alabama, and were in a burglary of the residence of James Barnes?" (Tr. 2134–2135)

The trial court sustained defendant's objection to the question and the prosecutor admitted defendant had not been convicted of the alleged burglary. The trial court admonished the jury to disregard any reference to the alleged crime in Alabama.

We agree that the prosecutor's question was improper, but we are of the opinion it was properly remedied when the court admonished the jury to disregard it.

■ Defendant's next assignment of error is that the State introduced irrelevant evidence of a co-defendant not on trial at the time, evidence of defendant's movements following the crime which had no relevance to it, and evidence in the defendant's possession when he was arrested which bore no relevance to the crime at bar.

Defendant's only authorities are *Gamble v. State,* Okl.Cr., 546 P.2d 1336 (1976) and *Berg v. State,* 97 Okl.Cr. 320, 262 P.2d 913 (1953), which speak to the proposition that "There may be some situations in which the admission of weapons may be unduly prejudicial." *Gamble v. State,* supra, at 1342.

*Berg* dealt with a charge of unlawful possession of intoxicating liquor and the State introduced weapons and other items not related to the charge. We held that to be prejudicial. Here, the State introduced a pistol found in the possession of the defendant when he was arrested. In *Gamble* this Court said, quoting from *Friday v. State,* Okl.Cr., 348 P.2d 1083 (1960), "the burden of establishing prejudice from the admission of incompetent evidence is upon the defendant." Id. at 1342. We are of the opinion that introduction of the pistol did not prejudice the defendant to the extent necessary to require reversal. We find that testimony of defendant's movements following the crime was necessary to corroborate the testimony of co-defendant Rame, an accomplice. Moreover, we are convinced that the above evidence did not contribute to defendant's conviction in the case at bar, and therefore, if error, it is harmless error.

■ It is the opinion of this Court that the errors complained of have neither resulted in a miscarriage of justice nor do they constitute a substantial violation of a constitutional or statutory right. Title 20 O.S.1971, § 3001. See also, *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), setting out the federal "harmless error" rule to be applied to a denial of a federal constitutional right; and, *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), applying an "overwhelming evidence" test under the *Chapman* "harmless error" rule. This assignment of error is dismissed.

■ Defendant, in his twelfth assignment of error, contends the trial court erred in quashing subpoenas of two co-defendants not on trial at the time, and so violated the defendant's constitutional rights of compulsory process for obtaining witnesses. The motions to quash were filed by the co-defendants' attorneys who informed the court their clients would invoke their constitutional rights against self-incrimination and refuse to testify.

However, the Oklahoma Constitution, Art. II, § 21, and its interpreting cases, also hold that "a person charged cannot be compelled to testify, either for himself, a codefendant or for the state, while he is a party in the case." *Trusty v. State,* Okl.Cr., 501 P.2d 1142, 1143 (1972). We hold the decision to quash the subpoenas was discretionary with the trial court and find this assignment of error without merit.

Defendant next contends that trial court erred in not allowing introduction of statements of co-defendants Gibson and Gregory, made in anticipation of plea bargaining. The trial court made its ruling on the premise that this Court earlier had refused to allow the State to use such statements against Gibson and Gregory. The defendant contends that since the trial court quashed defendant's subpoenas for the appearance of Gibson and Gregory, he should be allowed to put on the stand an officer who heard those statements.

■ Any such statements by an officer would obviously be hearsay, and our only question is, is it an exception to the hearsay rule. One of the criteria for permitting hearsay testimony is evidence of truthfulness of the out of court testimony. In fact, it must appear so truthful and so necessary that the opposition will be deemed not prejudiced in foregoing its right of cross-examination. In the case at bar, the statements of co-defendants Gregory and Gibson are sought to challenge the testimony of witness Rame who directly implicated the defendant in the killing. Defendant had his opportunity to cross-examine Rame at the time. Moreover, this Court is not convinced of the inherent truthfulness of the statements sought to be introduced. There is testimony that they are unsworn statements made for the purpose of plea bargaining. We therefore hold the trial court correctly refused to admit the officer's testimony.

■ Defendant contends the trial court erred in overruling his motion for a new trial on grounds of newly discovered evidence in that co-defendants Gibson and Gregory pleaded guilty to manslaughter in the first degree following the defendant's trial, thus eliminating the Fifth Amend-

ment barrier to their testimony in the defendant's case. The defendant therefore contends that written statements of Gibson and Gregory are "newly discovered evidence."

Defendant's argument is based on a hearing held following his conviction, during which co-defendants Gregory and Gibson gave testimony regarding their condition of intoxication from beer and drugs consumed preceding the crime, at which time they were allowed to plead guilty to a reduced charge of Manslaughter in the First Degree. Defendant contends that he was equally intoxicated and should be permitted to call Gregory and Gibson to prove it to a jury.

The rule on newly discovered evidence may be found in *Walters v. State,* Okl.Cr., 403 P.2d 267, 277 (1965), which states:

"The granting of a new trial on the ground of newly discovered testimony is a matter largely within the trial court's discretion and is not to be exercised except where there is reasonable probability that, if such evidence had been introduced, different results would have been reached. . . ." (Citations omitted)

One of the grounds for a new trial under 22 O.S.1971, § 952, is as follows:

"Seventh. When new evidence is discovered, material to the defendant, and which he could not with reasonable diligence have discovered before the trial, . . . and that the facts in relation thereto were unknown to the defendant or his attorney until after the trial jury in the case was sworn and were not of record. . . ."

The proper procedure for bringing this new evidence to the attention of the trial court is as follows in 22 O.S.1971, § 952:

". . . When a motion for a new trial is made on the ground of newly discovered evidence, the defendant must produce at the hearing in support thereof affidavits of witnesses, or he may take testimony in support thereof as provided in [22 O.S.1971, § 494] . . . ."

Defendant admits subpoenaing co-defendant Barry Rame but failing to call him as a witness. (Hearing for new trial, February 20, 1976, page 8.)

This Court is not convinced by defendant's arguments. We note instructions were given on both intoxication and manslaughter first degree. We note defendant subpoenaed co-defendant Barry Rame, but failed to call him. As for trial testimony of defendant's intoxication on the day of the crime, we note investigator Jack McKenzie offered his opinion that on the night of the crime the defendant "was either under the influence of intoxication or marihuana." (Tr. 2081) We note that co-defendant Clifford Rame testified that the defendant drove to the victim's house, that defendant later drove back to the house to burn it, and that the defendant smoked marihuana and drank beer on the day of the crime.

■ Newly discovered evidence will not be grounds for granting a new trial when it is cumulative. *Curtis v. State,* Okl.Cr., 518 P.2d 1288 (1974). Based on an intensive study of the transcript, this Court is of the opinion that although the testimony of Gibson and Gregory would add a dimension to the defense of intoxication, it is indeed cumulative. We are further convinced that the result of the trial would be the same and we thus dismiss defendant's assignment of error.

■ Defendant's fifteenth assignment of error goes to the proposition that imposition of Oklahoma's death penalty is unconstitutional. With this we must agree. *Davis v. State,* supra. We therefore modify defendant's sentence to life imprisonment as by our decision in *Riggs v. Branch,* supra.

■ Defendant's final assignment of error is that 22 O.S.1971, § 1271, which limits the attorney fee in indigent cases to $250.00, is an unconstitutional deprival or taking of private property for public use requiring a reasonable compensation under the Fifth Amendment, in that defendant's attorney spent 255½ hours in the case. While this Court commends the defense attorney for his thorough representation of his client, both at trial and on appeal, and

while we agree that a more just formula of compensation for attorneys handling indigent cases is definitely wanting, his challenge is not within the jurisdiction of this Court, but must be brought in a civil suit against the State.

The judgment and sentence is, accordingly, *MODIFIED* to Life Imprisonment at hard labor and otherwise *AFFIRMED.*

## ORDER DENYING PETITION FOR REHEARING

■ On rehearing in his first assignment of error, defendant argues that the State, after obtaining an admitted illegal statement from the juvenile-defendant, had the burden of showing that every piece of evidence introduced against him at trial was derived from a source other than the defendant. Defendant cites as his authority 10 O.S.1971, § 1109(a), which begins:

"No information gained by questioning a child shall be admissible into evidence against the child unless the questioning . . . is done in the presence of said child's parents, guardian, attorney, or the legal custodian of the child, and not until the child and his parents, or guardian, or other legal custodian shall be fully advised of their constitutional and legal rights, . . ."

The critical issue before us concerns the word, "information" as used in the statute cited above, and whether it refers narrowly only to a statement, confession or admission made by the juvenile during the questioning, or more broadly to evidence which can be admitted through a third party whose identity was discovered through questioning of the juvenile-defendant. We are of the opinion that the former is the proper interpretation.

This is a case of relative first impression in this State. The only prior decision of this Court dealing with interpretation of this specific part of the statute was *J. T. P. v. State*, Okl.Cr., 544 P.2d 1270 (1975), which stated at page 1277:

". . . A failure by the prosecution to show compliance with . . . [10 O.S. 1971, § 1109(a)] will render the *admission*

or *confession* of a child inadmissible into evidence against him without the necessity of further inquiry into circumstances. . . . The *statement* which is the product of that interrogation [outside presence of parents who waived constitutional rights] must be excluded from evidence." (Emphasis added, footnote omitted)

■ The defendant argues the exclusionary rule delineated in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), should exclude all evidence radiating from the illegal statement as fruits of the poisonous tree. But *Wong Sun* deals with a constitutional issue while the case at bar is concerned with a statutory right. We are of the opinion that, provided defendant was given his Miranda rights prior to questioning, the burden of proving independent source of evidence does not rest on the shoulders of the State. In this case there is evidence that the Miranda rights were read to the defendant (October 30, 1974, Hearing, page 32).

We further note that of the six witnesses to which defendant now objects on grounds that the State failed to prove its burden of independent source, the testimony of only one—Sheriff Brice Coleman—was objected to at trial, and that came during the cross examination.

We therefore dismiss this assignment of error.

■ Defendant next argues that refusal of the trial court to order identification of the informants utilized by the State denied his right of a fair trial. Defendant contends the identity of the informants is needed to determine if the evidence presented against him at trial came from a source other than his illegal statement. We dismiss this assignment in that it was not presented in the initial appeal to this Court and the cited authority, *Scott v. City of Tulsa*, Okl.Cr., 555 P.2d 1047 (1976), does not control. See, Rule 1.18, Rules of the Court of Criminal Appeals, 22 O.S., Ch. 18, App.

As his final assignment of error, defendant contends he was denied his constitutional right of compulsory process when the trial court quashed his subpoenas for two co-defendants on word from their attorneys that the co-defendants would plead the Fifth Amendment and refuse to testify. The co-defendants were held in jail at the time and following a hearing out of presence of the jury, the trial court granted the motion to quash the subpoenas. It is within the discretion of the trial court to grant or deny a writ of habeas corpus ad testificandum which is, in essence, what the subpoenas are. See, *Crutchfield v. State,* Okl.Cr., 553 P.2d 504 (1976). In light of the cumulative nature of their proposed testimony, plus the fact that they would undoubtedly have refused to testify as cases were pending against them, we find the trial court did not abuse its discretion, and so dismiss this assignment of error.

IT IS THEREFORE the order of this Court that the petition for rehearing be, and the same is hereby, *DENIED,* and the Clerk of this Court is directed to issue the mandate forthwith.

H. J. BUSSEY, P. J.

C. F. BLISS, Jr., J.

TOM BRETT, J.